# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. DANIJELA MOJSILOVIC | ) | |
| 2. ALEKSANDAR MOJSILOVIC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-14-886-R |
| | ) | |
| 1. STATE OF OKLAHOMA ex rel. THE | ) | |
| BOARD OF REGENTS FOR THE | ) | |
| UNIVERSITY OF OKLAHOMA; | ) | |
| 2. PURE PROTEIN, LLC., a domestic | ) | |
| limited liability company, and | ) | |
| 3. WILLIAM HILDEBRAND, an individual. | ) | |
| | ) | |
| Defendants. | ) | |

_____

## PLAINTIFFS' RESPONSE TO UNIVERSITY'S MOTION TO DISMISS
_____

## RESPECTUFULLY SUBMITTED THIS 20TH DAY OF JANUARY, 2015.

s/ George S. Freedman
George S. Freedman, OBA No. 15764
Sarah Rowe Clutts, OBA No. 31208
LESTER, LOVING & DAVIES, P.C.
1701 South Kelly Avenue
Edmond, Oklahoma 73013-3623
(405) 844-9900 - Telephone
(405) 844-9958 – Fax
Email: gfreedman@lldlaw.com
         sclutts@lldlaw.com

## TABLE OF CONTENTS

Table of Authorities ..............................................................................................ii- v

ARGUMENT AND AUTHORITIES ................................................................... 2

    Proposition I ................................................................................................. 2

        The Complaint states a claim for all Defendants' violated the TVPRA ....... 2

            A.      Standard of Review ................................................... 2

            B.      Defendants' threat of deportation is a TVPRA violation........ 3

            C.      Defendants intended to force the Mojsilovics into labor ........ 9

            D.      The University and Pure Protein had knowledge of the wrong doing through their agent, Hildebrand .................................... 9

    Proposition II ..................................................................................... 12

        Congress abrogated States' Sovereign Immunity when it enacted the TVPRA pursuant to § 2 of the Thirteenth Amendment ............................. 12

            A.      Congress has the authority to abrogate sovereign immunity when it acts under the plenary authority granted it under the Reconstruction Amendments ................................................. 12

            B.      The *Fitzpatrick* analysis is even more appropriate when applied to Congressional authority under the Thirteenth Amendment to prohibit and remedy involuntary servitude ............................................................... 15

            C.      Congress applied the TVPRA to "whoever" violates the Act pursuant to its Thirteenth Amendment authority ................. 19

            D.      The Oklahoma Governmental Tort Claims Act ("OGCTA") has no application to violations of Federal statutes when Congress has abrogated the State's sovereign immunity...... 23

Conclusion ........................................................................................... 24

CERTIFICATE OF SERVICE........................................................................... 25

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT14,

*Alden v. Maine*, 527 U.S. 706 (1999) ......................................................................... 12, 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................................... 2

*Blatchford v. Native Village of Noatak*, 501 U.S. 775 (1991)..................................... 12, 13

*Civil Rights Cases*, 109 U.S. 3 (1883).......................................................... 16, 17, 18, 21

*Clyatt v. United States,* 197 U.S. 207 (1905) .............................................................. 17, 18

*Edelman v. Jordan,* 415 U.S. 651 (1974) ........................................................................ 13

*Ex parte Virginia*, 100 U.S. 339 (1880) ............................................................... 14, 15, 16

*Felder v. Casey*, 487 U.S. 131 (1988) ............................................................................. 24

*Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) ..............................................13, 14, 15, 17, 22

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ...................................................................... 22

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ............................................................. 16, 18

*Hodges v. United States*, 203 U.S. 1 (1906)..................................................................... 17

*Howlett v. Rose*, 496 U.S. 356 (1990) ............................................................................. 24

*Jones v. Alfred H. Mayer Co.* 392 U.S. 409 (1968) ..................................................... 17, 18

*Martinez v. California*, 444 U.S. 277 (1980) ................................................................... 23

*Principality of Monaco v. Mississippi*, 292 U.S. 313 (1934) ........................................... 12

*Runyon v. McCrary*, 427 U.S. 160 (1976)....................................................................... 18

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ......................................... 12, 13, 20

*United States v. Harris*, 106 U.S. 629 (1883) ...................................................... 16, 17, 18

*United States v. Kozminski*, 487 U.S. 931 (1998) ............................................................. 7

*Zinermon v. Burch*, 494 U.S. 113 (1990) ............................................................ 5

**UNITED STATES COURTS OF APPEAL**

*Bd. Of County Comm'rs v. United States EEOC*, 405 F.3d 840 (10th Cir. 2005) ....... 21, 22

*Maryland Casualty Co. v. Queenan*, 89 F.2d 155 (10th Cir. 1937) .................................. 10

*Mitchell v. Cellone*, 389 F.3d 86 (3rd Cir. 2004) .............................................................. 18

*Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144 (10th Cir. 2010)........... 2

*United States v. Allen*, 341 F.3d 870 (9th Cir. 2003) ........................................................ 18

*United States v. Nelson*, 277 F.3d 165 (2nd Cir. 2002) ................................................ 18, 20

**UNITED STATES DISTRICT COURTS**

*Aguirre v. Best Care Agency, Inc.*, 961 F.Supp.2d 427 (E.D.N.Y. 2013)................... 3, 4, 7

*Alvarado v. Universidad Carlos Albizu*, 2010 WL 3385345 (S.D.Fl. 2010) ................. 7, 8

*Camayo v. John Peroulis & Sons Sheep*, 2012 WL 4359086 (D. Colo. 2012)............... 7, 8

*Garcia v. Curtright*, 2012 WL 1831865 (D.Or. 2012)..................................................... 8, 9

*Kiwanuka v. Bakilana*, 844 F.Supp.2d 107 (D.D.C 2012) .................................................. 4

*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F.Supp.2d 1134 (C.D. Cal. 2011) ............................................................................................................. 4, 7

*Price v. Public Service Co. of Okla.*, 2014 WL 1217962 (N.D.Okla. 2014) ..................... 2

*Ramos-Madrigal v. Mendiola Forestry Serv., LLC*, 799 F.Supp.2d 958 (W.D.Ar. 2011)...................................................................................................................... 8

*United States v. Garcia*, 2003 WL 22938040 (W.D.N.Y. 2003) .............................. 4, 7, 18

*United States v. Nicholson*, 185 F.Supp.2d. 982 (E.D.Wis. 2002).................................... 18

**FEDERAL STATUTES**

18 U.S.C. § 245 ................................................................................................ 18

18 U.S.C. § 1589 ........................................................................... 1, 3, 4, 20, 24

18 U.S.C. § 1590 ............................................................................... 1, 4, 20, 24

18 U.S.C. § 1595 ................................................................................... 3, 19, 20

42 U.S.C. § 1981 ................................................................................................ 18

42 U.S.C. § 1983 ................................................................................................ 24

42 U.S.C. § 1985 ......................................................................................... 16, 18

42 U.S.C. § 2000e .............................................................................................. 13

## OKLAHOMA STATE STATUTES

40 O.S. § 165.9 ............................................................................................... 1, 2

51 O.S. §§ 151, *et seq* .................................................................................... 23

## OKLAHOMA SUPREME COURT CASES

*McLin v. Trimble*, 1990 OK 74, 795 P.2d 1035 ................................................ 23

## OTHER AUTHORITIES

8 C.F.R. § 214.2 .................................................................................................. 4

20 C.F.R.  § 655.700 ........................................................................................... 4

20 C.F.R. § 655.705 ............................................................................................ 5

George Rutherglen, *The Badges of Slavery and the Power of Congress to Enforce the Thirteenth Amendment*, in Promises of Liberty: Thirteenth Amendment Abolitionism, and its Contemporary Validity (Alexander Tsesis ed. 2010) .................................................. 18

The Federalist No. 81 ....................................................................................... 13

U.S. Const. art. I .......................................................................................... 14, 22

U.S. Const. amend. XI ..................................................................................... 12

U.S. Const. amend. XIII ............................ 1, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23

U.S. Const. amend. XIV ............................................................... 13, 14, 15, 17

U.S. Const. amend. XV ...................................................................... 13

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114
Stat. 1466 (2000) ........................................................................ 19, 20

Danijela Mojsilovic and Aleksandar Mojsilovic ("Danijela" or "Aleksandar," or collectively, "the Mojsilovics"), who are siblings, were forced into involuntary servitude by William Hildebrand ("Hildebrand"), agent for State of Oklahoma ex rel. The Board of Regents for the University of Oklahoma ("University") and for Pure Protein, LLC ("Pure Protein") through intentional threats of deportation if the Mojsilovics refused to work without pay. Hildebrand knowingly used his position as director of the University of Oklahoma's medical research laboratory and sponsorship of the Mojsilovics' immigration status to require them to perform work for free for his private company, Pure Protein. The Complaint alleges sufficient facts against the University to state a claim under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1589 and 1590.

The University does not have sovereign immunity for the Mojsilovics' forced labor and trafficking claims brought under the TVPRA. Congress enacted the TVPRA under its plenary Thirteenth Amendment authority which abrogates Oklahoma's Eleventh Amendment sovereign immunity.[1]

For these reasons, the University's Motion to Dismiss should be denied.

---

[1] Plaintiffs agree the University and Hildebrand, in his official capacity, enjoy sovereign immunity over the Fair Labor Standards Act claims only. Moreover, the Mojsilovics concede the University and Hildebrand in his official capacity cannot be sued in Federal Court for violations of 40 O.S. § 165.9 unless these Defendants agree to waive their immunity in this case. The Mojsilovics requested they do so, should the Court agree it has subject matter over Plaintiffs' TVPRA claims. The defendants responded to the request by stating it would consider the request after the Court rules on their Motion to Dismiss.

## ARGUMENT AND AUTHORITIES

### Proposition I

### The Complaint states a claim for all Defendants' violated the TVPRA

### A. Standard of Review

This Court is required to accept as true all well-pleaded allegations, and view those allegations in the light most favorable to the Mojsilovics. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2010).  A claim is only subject to dismissal if it fails to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must evaluate the well-pleaded factual contentions against the law establishing the requisite elements of the claim to determine whether the allegations support a claim that is plausible. *Id.* at 678-79. The well-pleaded allegations of the Complaint more than meet the required elements of the Mojsilovics' TVPRA allegations.[2]

---

[2] Judge Frizzell's interlocutory Order in *Price v. Public Service Co. of Okla.*, 2014 WL 1217962 (N.D.Okla. March 24, 2014), cited by the University, is irrelevant and has no bearing on the issues, here. The only similarities between *Price* and the present matter are that the undersigned is involved in both cases and each alleged violations of Title 40 of the Oklahoma statutes. *Price* is a collective action involving on-call utility workers required to disrupt their personal pursuits in order to remain available for work if needed. Plaintiffs there alleged 40 O.S. § 165.9 could be used to enforce the overtime requirements of the FLSA. Judge Frizzell disagreed and dismissed the title 40 claim, not because it was not well-pleaded, but because he found title 40 could not be used to enforce the FLSA. Here, the Mojsilovics were not paid at all for work they performed. None of the Defendants has argued any relationship between the FLSA and § 165.9, or that the state statute could not be used to recover wages for unpaid hours worked (aside from the University's sovereign immunity argument).

### B. Defendants' threat of deportation is a TVPRA violation

Count II of the Complaint alleges the Mojsilovics were the victims of forced labor in violation of the TVPRA, specifically 18 U.S.C. § 1589. Section 1589 provides that "[w]hoever knowingly provides or obtains the labor or services of a person … (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person … would suffer serious harm or physical restraint" is civilly liable. 18 U.S.C. §§ 1589(a), 1595. Moreover, Subsection (b) extends liability to "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." § 1589(b).

"'Serious harm' includes 'threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable person in the same situation to continue to provide labor or services.'" *Aguirre v. Best Care Agency, Inc.*, 961 F.Supp.2d 427, 443 (E.D.N.Y. 2013), citing *Shukla v. Sharma*, 2012 WL 481795, *2 (E.D.N.Y. Feb. 14, 2012), which quoted *United States v. Bradley*, 390 F.3d 145, 151 (1st Cr. 2004), *vacated on sentencing grounds*, 545 U.S. 1101 (2005). *See also* § 1589(c)(2). "'Abuse of the law or legal process' is the 'use of threats of legal action, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designated in order to coerce someone into working against that

3

person's will.'" *Aguirre*, 961 F.Supp.2d at 444, citing *Shukla*, at *2. *See also United States v. Garcia*, 2003 WL 2003 WL 22938040, at *4-5 (W.D.N.Y. Dec. 2, 2003), cited by *Shukla*. "A scheme, plan or pattern violates § 1589 where it is intended to cause a person to believe that, if she did not perform such labor or services, she or another individual would suffer serious harm." *Aguirre*, 961 F.Supp.2d at 444, citing *United States v. Calimlin*, 538 F.3d 706, 713 (7th Cir. 2008). *See also Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F.Supp.2d 1134, 1144-46 (C.D. Cal. 2011) (plaintiffs sufficiently alleged a § 1589 claim by alleging defendants "intentionally manipulated the situation so that [p]laintiffs would feel compelled to remain and would obey all of [d]efendants' demands.").[3]

The Mojsilovics are Serbian nationals (Compl. ¶ 1). They entered the United States on H-1B visas. (Compl. ¶¶ 12-13). An H-1B visa allows admission to the United States for an initial period of no more than three years [8 C.F.R. § 214.2(h)(9)(iii)(A)(1)] and can be extended for no more than a total of six years [§ 214.2(h)(15)(ii)(B)(1)]. The process for obtaining the H-1B visa includes an application from the prospective employer which describes the type of work and the number of hours the nonimmigrant alien will be working [20 C.F.R. § 655.700(b)] and requires the employer to make "certain representations and

---

[3] Count III of the Complaint alleges TVPRA violations with respect to 18 U.S.C. § 1590. Section 1590 creates liability for "whoever knowingly … harbors … or obtains by any means, any person for labor or services in violation of this chapter …" Typically, and especially at the motion to dismiss phase, allegations that this statute is violated are sufficient where based on the same forced labor allegations as § 1589. *See, e.g., Kiwanuka v. Bakilana*, 844 F.Supp.2d 107, 115 (D.D.C 2012) (allegations that defendants threatened deportation was sufficient to establish involuntary servitude, which sufficiently stated a claim upon which relief can be granted under §§ 1589 and 1590.).

[agree] to several attestations regarding its responsibilities, including the wages, working conditions, and benefits to be provided to the H-1B nonimmigrants." 20 C.F.R. § 655.705(C)(1).

The Complaint alleges the University represented Aleksandar "was hired to conduct DNA sequencing and tissue typing for research and clinical studies," while Danijela "was hired to make transfectants and tissue cultures." (Compl. ¶ 16). The University represented both "were hired to work in Defendant University's Health Sciences medical research laboratory under the direction of Defendant Hildebrand." *Id.* The University further represented the Mojsilovics' work would be "limited to thirty-two (32) hours per week," which was "increased to forty (40) hours on or about January, 2008." (Compl. ¶ 19).

In addition to serving as the director of the medical research laboratory, Hildebrand was the owner and operator of Pure Protein, a private company. (Compl. ¶15).[4] Once the Mojsilovics were under the complete control of Hildebrand, the Complaint alleges, "Hildebrand used his role as the supervisor of Plaintiffs' work for Defendant University, to force Plaintiffs to work for Defendant Hildebrand and Defendant Pure Protein, or to face deportation upon threat of termination." (Compl. ¶ 27). Hildebrand used his positions at the University and Pure Protein to control all aspects of the Mojsilovics' employment.

---

[4] Although Pure Protein disputes Hildebrand is the owner and operator of Pure Protein (*see* pgs. 5-6 of its Motion to Dismiss. Dkt. #17), whether Hildebrand was the "owner and operator" of Pure Protein (as the Mojsilovics' allege) or "has a small ownership interest in, and is a member of, Pure Protein" (as Pure Protein alleges), the fact remains Hildebrand controlled all aspects of the Mojsilovics' employment at both the University and Pure Protein. (Compl. ¶¶ 14, 17, 21, 23, 26, 27, 35 and 36). Of course, this is a question of fact not appropriate for review on motions to dismiss, as this Court is required to accept as true all well pleaded facts. *Zinermon v. Burch*, 494 U.S. 113, 118 (1990).

(Compl. ¶¶ 14, 20, 22 and 23). In other words, the Mojsilovics were employed by two organizations, and their employment by one was not "completely disassociated from employment by the other," because Hildebrand controlled all aspects of their employment at both the University and Pure Protein, pursuant to authority each entity granted him. (Compl. ¶¶ 10, 11, 14, 15, 16, 17, 21, 22, 23, 24, 25, 26 and 27; quoted language from 29 C.F.R. § 791.2).

The Complaint further alleges that even though the University "represented" and "attested" to immigration officials that Aleksandar would be performing "DNA sequencing and tissue typing" and Danijela would be "making transfectants and tissue cultures," (Compl. ¶ 16), Hildebrand demanded Danijela "create Class I and Class II transfectants, and for [Aleksandar] typing and tissue matching for transplant donors and patients," to benefit himself and Pure Protein. (Compl. ¶ 15). Hildebrand demanded, as a condition of the Mojsilovics' continued employment with the University (which thus was a condition of maintaining their immigration status), that the Mojsilovics work for his private company, Pure Protein, largely without pay. (Compl. ¶¶ 17, 18, 20 and 21).

"When Plaintiffs expressed their concerns … Hildebrand became verbally abusive and threatened Plaintiffs that he would take action to effectuate their deportation or revocation of their work visas." (Compl. ¶ 29). The Complaint provides specific, non-exhaustive examples of Hildebrand's threats. One example involved the Mojsilovics' planned travel while the laboratory was scheduled to be closed for the holidays. Hildebrand demanded the Mojsilovics work in the laboratory over the holidays, and told them if they refused he "would call immigration" and that they would be "on a plane to Serbia if they

are not in the lab the next morning." (Compl. ¶ 30). The Complaint alleges these types of statements and interactions occurred "repeatedly," and that, "[w]hen Plaintiffs inquired as to why they were not being paid for the work, Defendant Hildebrand responded by telling them that if they did not do what they were told without complaining, he would contact immigration and have them sent back to Serbia." *Id.*

"The threat of deportation alone may support a claim for forced labor." *Aguirre, supra,* at 444, citing *Calimlin*, 538 F.3d at 713. *See also United States v. Kozminski*, 487 U.S. 931, 948 (1998) ("[T]hreatening … an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude."); *Nunag-Tanedo*, 790 F.Supp.2d at 1146 (threats, *inter alia*, to fire plaintiffs or deport them sufficiently stated a claim for forced labor); *Garcia*, 2003 WL 22956917, at *4 (threatening deportation "clearly fall[s] within the concept and definition of 'abuse of legal process' since the alleged objective for [such conduct] was to intimidate and coerce [the plaintiffs] into 'forced labor'") (citations omitted).

In *Camayo v. John Peroulis & Sons Sheep*, 2012 WL 4359086 (D. Colo. Sept. 24, 2012), the Colorado District Court denied a motion to dismiss, finding "abuse of the legal process" based on allegations "the employer threaten[ed] to involve law enforcement or immigration authorities in order to persuade the employee to remain faithful or continue working." *Id.* at *12-13[5], citing *Kiwanuka v. Bakilana*, 844 F.Supp.2d at 115 (refusing to

---

[5] *Camayo* criticized reliance on *Alvarado v. Universidad Carlos Albizu*, 2010 WL 3385345 (S.D.Fl., Aug. 25, 2010), for the counterproposition that "employer's comments about

dismiss "a TVPA claim by a Tanzanian national who alleged that her employer 'abused the legal process by threatening her with deportation should she fail to perform the work demanded of her'"); and *Ramos-Madrigal v. Mendiola Forestry Serv., LLC*, 799 F.Supp.2dd 958, 960 (W.D.Ar. 2011) (denying a motion to dismiss where employer, *inter alia*, threatened employees "with serious immigration consequences in order to prevent them from leaving employment").

*Garcia v. Curtright*, 2012 WL 1831865 (D.Or. May 17, 2012), is also instructive. In *Garcia*, the employee was hired to provide cleaning services for certain properties. However, the owner of the employer company threatened deportation if the employee refused to take the owner's mother into the employee's home and provide continual care. The Oregon District Court denied the employer's motion to dismiss, reasoning "the alleged threatened deportation of plaintiff and her family would on the face of the complaint, constitute sufficient serious threatened harm to preclude dismissal of her second claim at this stage of the litigation." *Id.* at * 4. The court further pointed out that it must view the

---

immigration consequences that could occur, do not by themselves constitute an abuse of the legal process[.]" Notwithstanding this criticism from a Tenth Circuit district court, all three Defendants here cited *Alvarado* for this proposition. However, as *Camayo* points out, "*Alvarado* presents a fairly dubious claim on its facts, as the employee there was a university professor being paid $95,000 per year, complaining that his employer's refusal to grant him extra compensation for performing the extra tasks of being Director of Recruitment and Admissions constituted a violation of the TVPA." *Camayo* at * 14, n. 5. In contrast to the allegations here and in *Camayo*, "*Alvarado* did not involve 'threats' of deportation or the involvement of police; rather, the employer merely threatened to withdraw support for (and retention of an attorney to assist) the employee's application to extend the employee's labor certification." *Id.*

threat of harm "from the vantage point of a reasonable person in the place of the victim."[6] *Id.* And, the "employer must intend to cause the victim to believe that she would suffer serious harm if she did not continue to work." *Id.*

### C. Defendants intended to force the Mojsilovics into labor.

In each motion to dismiss, Defendants argue the Complaint fails to adequately allege the "intent" element as it applies to them. (Pure Protein, Dkt. # 17, pgs. 5-7 and 14-15; University, Dkt. # 19, pg. 12; and Hildebrand, Dkt. #21, pgs. 12-15). However, the Complaint alleges "Defendant Hildebrand used his role as the supervisor of Plaintiffs' work for Defendant University, to ***force*** Plaintiffs to work for Defendant Hildebrand and Defendant Pure Protein, or to face deportation ***upon threat*** of termination." (Compl. ¶ 27) (emphasis added). Further, the Mojsilovics allege all Defendants "***knowingly*** participated in procuring the continued employment of, and provision of services by, Plaintiffs for Defendants' benefit." (Compl. ¶ 42) (emphasis added). And, the Complaint alleges, Defendants did so "for the ***pecuniary purpose*** of inducing Plaintiffs to continue working without pay in violation of the FLSA [and] the TVPRA." (Compl. ¶ 43) (emphasis added). Finally, the Mojsilovics allege Defendants' conduct "constituted a scheme, plan or pattern ***intended*** to cause the Plaintiffs to believe that if they did not perform the research and associated labor, they would suffer serious harm, including deportation." (Compl. ¶ 44) (emphasis added). At the pleading stage, no more than allegation of intent is required.

---

[6] The Mojsilovics allege they "reasonably feared that Defendant Hildebrand would take action against their immigration status if they did not complete the work Defendant Hildebrand required without pay and without protest." (Compl. ¶ 31).

**D. The University and Pure Protein had knowledge of the wrong doing through their agent, Hildebrand.**

Similarly, the University and Pure Protein argue that each should be dismissed because they are dissatisfied with the factual allegations relating to their knowledge of the wrongdoing. [Pure Protein, Dkt. # 17, pgs. 14-15 ("Plaintiffs fail to offer well-pleaded facts plausibly showing that *Pure Protein* 'knowingly' used any actionable threat to obtain their labor"); University, Dkt. #19, pg. 12 ("There are no factual allegations of alleged knowledge of or wrongdoing by the University"). The Complaint provides extensive allegations demonstrating Hildebrand was authorized and designated by the University and Pure Protein to supervise the Mojsilovics. (Compl. ¶ 14 – "Hildebrand supervised and controlled all aspects of Plaintiffs' work in the laboratory for Defendant University."; Compl. ¶ 23 – "Hildebrand supervised Plaintiffs as owner of his personal company, Defendant Pure Protein."; ¶ 26 – "Hildebrand, as an employee of Defendant University, had the ability to exercise complete control over Plaintiffs' employment terms and conditions, and he was authorized to fire, hire or modify the employment conditions of the Plaintiffs."; and Compl. ¶ 27 – "Hildebrand used his role as the supervisor of Plaintiffs' work for Defendant University, to force Plaintiffs to work for Defendant Hildebrand and Defendant Pure Protein, or to face deportation upon threat of termination.")  As such, Hildebrand's knowledge and actions toward the Mojsilovics is attributable to the University and Pure Protein. *Maryland Casualty Co. v. Queenan*, 89 F.2d 155, 156-157 (10th Cir. 1937) ("It is a well settled general rule that notice to, or knowledge of, an agent

10

while acting within the scope of his authority and in reference to a matter over which his authority extends, is notice to, or knowledge of, his principal.").

Hildebrand, individually as acting on behalf of the University and Pure Protein, clearly acted with requisite knowledge. (Compl. ¶ 17 – "Hildebrand *demanded* that Plaintiffs, in addition to their work in Defendant University's laboratory, also complete work for Defendant Pure Protein."; Compl. ¶ 18 – "Hildebrand did not ensure Plaintiffs were paid for the majority of the work *demanded* they do for his private business, Defendant Pure Protein."; Compl. ¶ 19 – "The hours of work that Defendant Pure Protein and Defendant Hildebrand *demanded* Plaintiffs complete, were hours in excess of those contracted for by Defendant University."; Compl. ¶ 21 – "Because Defendant Hildebrand *required* Plaintiffs to work for both Defendant University and Defendant Pure Protein, Plaintiffs worked far in excess of forty (40) hours per week."; Compl. ¶ 24 – "Hildebrand used his role as laboratory director *to condition* Plaintiffs' continued employment for Defendant University, on their completion of work, without pay, for Defendant Pure Protein."; Compl. ¶ 27 – "Hildebrand used his role as the supervisor of Plaintiffs' work for Defendant University, *to force* Plaintiffs to work for Defendant Hildebrand and Defendant Pure Protein, or to face deportation upon threat of termination." (All emphasis added). Thus, "Defendants University, Pure Protein and Hildebrand *knowingly* participated in procuring the continued employment of, and provision of services by, Plaintiffs for Defendants' benefit." (Compl. ¶ 42)(Emphasis added).

The Mojsilovics have sufficiently alleged all Defendants violated the TVPRA in requiring them to work without pay, under threat of deportation. To the extent the Court

deems the above allegations insufficient, the Mojsilovics hereby request leave to amend the Complaint to include additional facts.

**Proposition II**

**Congress abrogated States' Sovereign Immunity when it enacted the TVPRA pursuant to § 2 of the Thirteenth Amendment.**

**A. Congress has the authority to abrogate sovereign immunity when it acts under the plenary authority granted it under the Reconstruction Amendments.**

The University claims this Court does not have subject matter jurisdiction because it enjoys sovereign immunity pursuant to the Eleventh Amendment. (Dkt. # 19, University Brief, pg. 2). The Supreme Court recognizes that "[a]lthough the Constitution establishes a National Government with broad, often *plenary authority over matters within its recognized competence*, the founding document 'specifically recognizes the States as sovereign entities." *Alden v. Maine*, 527 U.S. 706, 713 (1999), quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 71, n. 15 (1996) (emphasis added). While "Eleventh Amendment immunity" is "convenient shorthand" for describing sovereign immunity, it is "something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment." *Alden*, 527 U.S. at 712. "The States entered the federal system with their sovereignty intact." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991).

However, "where there has been 'a surrender of this immunity in the plan of the convention[,]'" federal courts have subject matter jurisdiction and the states do not enjoy sovereign immunity. *Alden*, 527 U.S. at 729, quoting *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934), which quoted The Federalist, No. 81, at 487 (footnote omitted). "This separate and distinct structural principle is not directly related to the scope of the judicial power established by Article III, but inheres in the system of federalism

13

established by the Constitution." *Alden*, 527 U.S. at 730. Thus, Congress may abrogate States' sovereign immunity without their consent if "the States were required to surrender this power to Congress pursuant to the constitutional design." *Id.* at 730-31, citing *Blatchford*, 501 U.S. at 781.

Indeed, the Supreme Court has explicitly held that in adopting the Reconstruction Amendments [Thirteenth, Fourteenth and Fifteenth], "the people required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution, so that Congress may authorize private suits against nonconsenting States." *Alden*, 527 U.S. at 755, citing *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). "By imposing explicit limits on the powers of the States and granting Congress the power to enforce them, the [Fourteenth] Amendment 'fundamentally altered the balance of state and federal power struck by the Constitution." *Alden*, 527 U.S. at 756, quoting *Seminole Tribe*, 517 U.S. at 59. "When Congress enacts appropriate legislation to enforce this Amendment … federal interests are paramount, and Congress may assert an authority over the States which would be otherwise unauthorized by the Constitution." *Alden*, 527 U.S. at 756 citing *Fitzpatrick*, 427 U.S. at 456.

In *Fitzpatrick*, the Supreme Court found Congress acted within the authority granted it by § 5 of the Fourteenth Amendment when it abrogated sovereign immunity in the 1972 amendments to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. *Fitzpatrick*, 427 U.S. at 447-48 ("The principal question presented by these cases is whether, as against the shield of sovereign immunity afforded the State by the Eleventh Amendment, *Edelman v. Jordan*, 415 U.S. 651 (1974), Congress has the power to authorize

14

federal courts to enter such an award against the State as a means of enforcing the substantive guarantees of the Fourteenth Amendment.") The *Fitzpatrick* Court distinguished Congressional action taken under its Reconstruction Amendment authority, from legislation passed under Article I of the Constitution (over which the Supreme Court has reserved significant oversight, with respect to Congressional action), because the Reconstruction Amendments "quite clearly contemplates limitations on [States'] authority." *Id.* at 452. "The substantive provisions are by express terms directed at the States." *Id.*

To exemplify Congressional authority under the Fourteenth Amendment to abrogate sovereign immunity, *Fitzpatrick* cited *Ex parte Virginia*, 100 U.S. 339 (1880). In that case, Congress used the Fourteenth Amendment to prohibit exclusion of jurors on the basis of race. A state judge who had been indicted under a federal statute challenged the racial prohibition as "beyond Congress' power to enact under either the Thirteenth Amendment or the Fourteenth Amendment." *Fitzpatrick*, 427 U.S. at 453-54. Finding sufficient authority, as *Fitzpatrick* noted, the Supreme Court in *Ex parte Virginia* reasoned:

> The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative or judicial. Such enforcement is no invasion of State sovereignty. No law can be, which the people of the United States, empowered Congress to enact…. [I]n exercising her rights, a State cannot disregard the limitations which the Federal Constitution has applied to her power. Her rights do not reach to that extent. Nor can she deny to the general government the right to exercise all its granted powers, though they may interfere with the full enjoyment of rights she would have if those powers had not been thus granted. Indeed, every addition of power to the general government involves a corresponding diminution of the government powers of the States. It is carved out of them.

15

…..

> …. Were it not for the fifth section of the [Fourteenth] amendment, there might be room for argument that the first section is only declaratory of the moral duty of the State…. But the Constitution now expressly gives author for congressional interference and compulsion in the cases embraced within the Fourteenth Amendment.

427 U.S. at 454-55, quoting *Ex parte Virginia*, 100 U.S. at 346-48.

Citing *Ex parte Virginia* and other cases in accord, the *Fitzpatrick* Court concluded: "There can be no doubt that this line of cases has sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the States." *Fitzpatrick*, 427 U.S. at 455-56. Thus, "[w]hen Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority." *Id.* at 456.

**B. The *Fitzpatrick* analysis is even more appropriate when applied to Congressional authority under the Thirteenth Amendment to prohibit and remedy involuntary servitude.**

The Thirteenth Amendment to United States Constitution was the first of the three Reconstruction Amendments to be ratified by the States. Section 1 provides: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, **shall exist within the United States**, or any place subject to their jurisdiction." (Emphasis added.) In approving § 2 of the Amendment, the people and the states gave to "Congress … power to enforce this article by appropriate legislation."

Thus, by definition in the Thirteenth Amendment, Congress has the authority to enact "appropriate legislation" to outlaw "involuntary servitude" anywhere and everywhere "within the United States, or any place subject to their jurisdiction" No exception is made allowing slavery to exist if a State is the enslaver; the Amendment obviously and necessarily includes the States. *See e.g. Ex parte Virginia*, *supra*: "The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative or judicial."

The Supreme Court first considered Congress' § 2 authority in *United States v. Harris*, 106 U.S. 629 (1883). Therein, the Supreme Court stated § 2 "gives power to Congress to protect all persons … from being in any way subjected to slavery or involuntary servitude, except as a punishment for crime, and in the enjoyment of that freedom which it was the object of the Amendment to secure." *Id.* at 640. The Court identified the Civil Rights Act of 1866 (which provided citizenship to all persons born in the United States and not subject to foreign power regardless of previous slave status) as a permissible use of Congress' § 2 authority. *Id.*[7]

The Supreme Court next addressed § 2 in the *Civil Rights Cases*, 109 U.S. 3 (1883), which again found the Civil Rights Act of 1866 a permissible use of Congressional

---

[7] *Harris* determined the Klu Klux Klan Act of 1871 unconstitutionally exceeded Congressional authority. However, the Supreme Court, in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), upheld the same statute, codified at 42 U.S.C. § 1985(3), and distinguished *Harris* because it used the now discredited view that statutes could only be invalidated in their entirety rather than severing invalid provisions.

authority, but struck down the Civil Rights Act of 1875 because it was not limited to state action and applied to private entities. *Id.* at 20. Even though it struck down the law, the Supreme Court affirmed that Congress had the authority under the Thirteenth Amendment to enact legislation to abolish the "necessary incidents" of slavery which "consitut[ed] its substance and visible form" including, *inter alia*, compulsory service. *Id.* at 22.

In *Clyatt v. United States,* 197 U.S. 207, 215-18 (1905), the Supreme Court "enterain[ed] no doubt" that § 2 empowered Congress to ban peonage, defined as "a status or condition of compulsory service, based upon the indebtedness of the peon to the master." Even in *Hodges v. United States*, 203 U.S. 1 (1906), which infamously struck down the Civil Rights Act of 1866, the Supreme Court affirmed as absolute Congressional authority to enact legislation to prohibit slavery and involuntary servitude. *Id.* at 16.

In 1968, the Supreme Court established the modern day view of Congress' expansive § 2 authority to enact legislation not only to prohibit and remedy involuntary servitude, as the TVPRA clearly does, but to "pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States[.]" *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439 (1968). "Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* at 440. *Jones* thus makes clear that just as the *Fitzpatrick* Court found with respect to § 5 of the Fourteenth Amendment, § 2 is a significant grant of legislative power to Congress to pass "necessary and proper" laws applicable to State actors and private persons alike.

Thus, the modern Supreme Court view is to end the differentiation the Supreme Court may previously have implied existed between Congressional action that addresses the "badges and the incidents of slavery" from those actions that attack slavery directly. *See Harris, Clyatt, Civil Rights Cases, supra.* As one commentator put it, *Jones* expanded "the legitimate ends under the [Thirteenth Amendment] … from abolition of slavery to eliminating the consequences of slavery, with a concomitant increase in the appropriate means that Congress could choose to reach those ends." George Rutherglen, *The Badges of Slavery and the Power of Congress to Enforce the Thirteenth Amendment*, in Promises of Liberty: Thirteenth Amendment Abolitionism, and its Contemporary Validity (Alexander Tsesis ed. 2010).

Since *Jones*, Courts have uniformly upheld Congress' § 2 authority to enact legislation applicable to States and private entities, when attacking the badges and incidents of slavery. *Runyon v. McCrary*, 427 U.S. 160 (1976) (42 U.S.C. § 1981, as applied to race discrimination in contracts for private school education); *Griffin v. Breckenridge*, *supra* (42 U.S.C. § 1985); *Mitchell v. Cellone*, 389 F.3d 86 (3rd Cir. 2004) (Fair Housing Act); *United States v. Allen*, 341 F.3d 870 (9th Cir. 2003) (18 U.S.C. § 245(b)(2)(B)); *United States v. Nelson*, 277 F.3d 165 (2nd Cir. 2002) (prohibiting racial and religious attacks against Jews); *United States v. Garcia*, 2003 WL 22938040 (W.D.N.Y., Dec. 2, 2003) (upholding Migrant and Seasonal Worker Protection Act); *United States v. Nicholson*, 185 F.Supp.2d. 982 (E.D.Wis. 2002) (civil rights conspiracy statute and Fair Housing Act).

The Supreme Court has thus made clear that Congress has wide latitude to enact legislation pursuant to § 2 of the Thirteenth Amendment to eradicate and remedy involuntary servitude whether perpetrated by the State, private entities or individuals.

**C. Congress applied the TVPRA to "whoever" violates the Act pursuant to its Thirteenth Amendment authority.**

The University contends in section I(B)(e)(ii) of its Brief that the statute's universal application of the law to all actors, private or state, is insufficient to abrogate sovereign immunity. However, the University overlooks the fact that the Thirteenth Amendment long ago abolished state power regarding slavery. Thus, when Congress acts to outlaw slavery, it necessarily applies to the States. In enacting the TVPA and later the TVPRA, Congress expressly stated it intended "whoever" violates the act to be liable.

Congress expressly acted under its § 2 authority when it authorized private suits for money damages against human traffickers in the TVPRA. Public Law 106-386, §§ 102(b)(12), (21) and (22), 114 Stat. 1466 (2000).[8] Describing the "[t]rafficking in persons [as] a modern form of slavery,"[9] Congress found "[t]rafficking for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market. Within the context of slavery, servitude, and labor or services which are obtained or maintained through coercive conduct that amounts to a condition of servitude, victims are subjected to a range of violations." § 102(b)(12). "The right to be free from slavery and involuntary servitude is among those

---

[8] The 2000 trafficking statute did not include a civil remedy. The civil remedy was placed in the statute as part of the 2003 reauthorization act. 18 U.S.C. § 1595.
[9] Sec. 102(b)(1).

20

unalienable rights. Acknowledging this fact, the United States outlawed slavery and involuntary servitude in 1865, recognizing them as evil institutions that must be abolished," § 102(b)(22), and leaving no doubt Congress enacted the TVPRA to combat slavery directly, under its § 2 authority.

Recognizing its Thirteenth Amendment authority to enact the TVPRA and to apply it to State actors, Congress broadly provided that **"[w]hoever** knowingly provides or obtains the labor or services of a person" is guilty of a crime. 18 U.S.C. § 1589 (emphasis added). With 18 U.S.C. § 1595, Congress permitted victims of § 1589 and § 1590 to bring a civil action against the perpetrator(s) "in an appropriate district court of the United States."

The University incorrectly argues the "expressed intent" rule in *Seminole Tribe*, 517 U.S. at 55-57 should apply. As is made clear directly in *Seminole Tribe* and *United States v. Nelson*, 277 F.3d 164, 181 n. 17 (2nd Cir. 2002) (a case cited by the University in n. 1), Congressional authority to abrogate sovereign immunity under § 2 of the Thirteenth Amendment was unaffected by *Seminole Tribe*. "The Supreme Court, in *Seminole Tribe*, expressly re-affirmed its earlier holding in *Fitzpatrick* that Congress does enjoy power to abrogate State sovereign immunity under the Fourteenth Amendment." 277 F.3d at 181 n. 17. "Indeed, the Court recognized that 'the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution,' and consequently that, 'through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to

21

abrogate the immunity from suit guaranteed by that Amendment." *Id.,* quoting *Seminole Tribe*, 517 U.S. at 59.

The Thirteenth Amendment is quite specific in that it absolutely bars slavery and involuntary servitude, and expressly grants Congress the authority to prevent the States from engaging in slavery and involuntary servitude. Hence, Congress was not required to "expressly" state its intent to apply the statute to the States. The Constitution does that, and the States, in ratifying the Thirteenth Amendment, long ago agreed to the end of slavery. Because it did not carve out an exception to the statute for the States, Congress used its § 2 authority to apply the TVPRA to everyone – "whoever" – including state actors.

Moreover, the University overlooks the fact the TVPRA attacks slavery and involuntary servitude directly and not just the "badges and incidents of slavery." Although the Supreme Court sometimes articulates more stringent rules apply to Congress's ability to abrogate sovereign immunity when addressing the "badges and incidents of slavery," the Supreme Court has steadfastly upheld statutes that abrogate or attack slavery, peonage and involuntary servitude directly. As the Supreme Court stated in *Civil Rights Cases*, 109 U.S. at 20, the Thirteenth Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." Thus, "under the Thirteenth Amendment the legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating under the acts of individuals, whether sanctioned by state legislation or not." *Id.* at 23.

The Tenth Circuit has made this point abundantly clear. In *Bd. Of County Comm'rs v. United States EEOC*, 405 F.3d 840, 850 (10th Cir. 2005), the Tenth Circuit compared the express abrogation language with respect to Article I Congressional authority with Congressional authority under the Reconstruction Amendments. With Article I authority, the Supreme Court requires Congress to make a "plain statement" abrogating the States' sovereign immunity. *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). "Plain statements are required to clarify Congress's intent to alter the balance when legislating under the Commerce Clause[.]" 405 F.3d at 850. However, as the Tenth Circuit stated, "The [Supreme] Court has recognized this distinction between legislation enacted under Congress' power to enforce the Civil War Amendments from legislating under other sources of authority." *Id.,* citing *Gregory*, 501 U.S. at 468; and *Fitzpatrick*, 427 U.S. at 456. Thus, the "plain statement" rule does not apply to Reconstruction Amendment authority.

Congress here applied the TVPRA to "whoever" violates the act. "Whoever" necessarily includes the States and State actors. Indeed, to hold  the TVPRA does not apply to the States would alter the Thirteenth Amendment itself, by allowing States to engage in slavery, even though the Thirteenth Amendment *absolutely bars slavery within the United States*. A law which allowed the states to engage in slavery, would not be "enforce[ing] this article by appropriate legislation." To the contrary, to accept the University's argument would be to abrogate the Thirteenth Amendment by allowing states to engage in slavery, thereby rendering meaningless the promise that "[n]either slavery nor involuntary servitude … shall exist within the United States." In adopting the TVPRA, Congress deemed the

23

prohibited conduct the "modern form of slavery." As the Thirteenth Amendment absolutely bars slavery, all – including the States – are barred from engaging in such conduct, whether in the form of chattel slavery or slavery in its modern form.

Indeed, the sole exception in the Thirteenth Amendment – involuntary servitude may exist as punishment for crime whereof the party shall have been duly convicted," proves the point. This is not an exception for public Universities to enslave foreign nationals. It is an exception that applies only in one, specific circumstance, not applicable here.

The University cannot practice slavery. It is not a Thirteenth Amendment free zone. Congress acted under its plenary Thirteenth Amendment power to abrogate the States' sovereign immunity when it enacted the TVPRA. The University's motion to dismiss the Mojsilovics' TVPRA claims must be denied.

**D. The Oklahoma Governmental Tort Claims Act ("OGTCA") has no application to violations of Federal statutes when Congress has abrogated the State's sovereign immunity.**

In Section I(B)(i), the University argues the OGTCA, 51 O.S. §§ 151, *et seq.,* bars the Mojsilovics' TVPRA claims. The OGTCA, however, is irrelevant to Plaintiffs' claims.

The "assertion of an immunity is not a state-law created defense to a federal cause of action. The issue of the application of an immunity is one of federal law." *McLin v. Trimble*, 1990 OK 74, ¶ 7, 795 P.2d 1035, 1038, citing *Martinez v. California*, 444 U.S. 277, 284, n.8 (1980). "A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper

24

construction may be enforced." *Martinez*, *id*. Thus, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988), quoting *Free v. Bland*, 369 U.S. 663, 666 (1962).

Burdening a federal right through application of a state notice-of-claim statute is "impermissible." The "defendant-specific focus of the notice requirement serves to distinguish it, rather starkly, from rules uniformly applicable to all suits … and discriminates against the precise type of claim Congress has created." *Felder*, 487 U.S. at 144-145. Thus, *Felder* held, with respect to rights created by 42 U.S.C. § 1983, a "state law that conditions that right of recovery upon compliance with a rule designed to minimize governmental liability, and that directs injured persons to seek redress in the first instance from the very targets of the federal legislation, is inconsistent in both purpose and effect with the remedial objectives of the federal civil rights law." *Felder*, 487 U.S. at 153. A "State cannot immunize an official from liability for injuries compensable under federal law." *Howlett v. Rose*, 496 U.S. 356, 360 (1990).

The OGTCA is irrelevant to the Mojsilovics' claims pursuant to the TVPRA.

## Conclusion

The Mojsilovics have stated a claim against the University for violations of § 1589 (Count II) and § 1590 (Count III), of the TVPRA. The University has no sovereign immunity.

**RESPECTUFULLY SUBMITTED THIS 20th DAY OF JANUARY, 2015.**

s/ George S. Freedman
George S. Freedman, OBA No. 15764
Sarah Rowe Clutts, OBA No. 31208
LESTER, LOVING & DAVIES, P.C.
1701 South Kelly Avenue
Edmond, Oklahoma 73013-3623
(405) 844-9900 - Telephone
(405) 844-9958 – Fax
Email: gfreedman@lldlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 20, 2015, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Spencer F. Smith, OBA No. 20430
Joshua W. Solberg, OBA No. 22308
McAfee & Taft
A Professional Corporation
Tenth Floor, Two Leadership Square
211 N. Robinson Avenue
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Email: spencer.smith@mcafeetaft.com
        Joshua.solberg@mcafeetaft.com
*Counsel for Pure Protein*

Jason S. Boulette (*PHV*)
Steven H. Garrett (*PHV*)
Boulette & Golden L.L.P
2801 Via Fortuna, Suite 530
Austin, Texas 78746
Telephone: (512) 732-8901
Facsimile: (512) 732-8905
Email: jason@boulettegolden.com
        steven@boulettegolden.com
*Counsel for Pure Protein*

Stephen R. Johnson, OBA No. 4724
Heidi J. Long, OBA No. 17667
James E. Warner III, OBA No. 19593
Holladay & Chilton, PLLC
204 N. Robinson Ave, Ste 1550
Oklahoma City, Oklahoma 73102
Telephone: (405) 236-2343
Facsimile: (405) 239-2349
*Counsel for Defendant Hildebrand*

Shawnae E. Robey, OBA No. 19195
Gus H. Buthman, OBA No. 22089
Eric A. Moen, OBA No. 31155
Office of Legal Counsel
University of Oklahoma
660 Parrington Oval, Ste 213
Norman, Oklahoma 73019
Telephone: (405) 325-4124
Email: srobey@ou.edu
        gbuthman@ou.edu
        emoen@ou.edu
*Counsel for University of Oklahoma*

26